## Sipes v. Seymour et al.

### (Circuit Court, D. Colorado. December 20, 1890.)

ACTIONS ON CONTRACT—PLEADING—COMPLAINT.

    A written contract provided that in consideration of $800, as well as for the services rendered, S. agreed to pay plaintiff a commission of 10 per centum of the cash that might be received for a certain mine, on a sale thereof, and also to deliver to plaintiff "all certificates of shares of stock that may be received in payment for the said * * * mine, over and above the amount of such shares at the price at which I may accept the same as will make the net price received by me for the said mine $225,000." In an action against S. and other persons, the complaint alleged that the mine had been sold by S. for $200,000 in cash, and $800,000 in stock, and averred that plaintiff was entitled to recover from defendants his proportion of both cash and stocks. The complaint showed that the consideration from plaintiff for the contract was about $1,300, but did not set forth any of the negotiations or the understanding of the parties as to the agreement. *Held*, that a demurrer to the complaint would be sustained, as the meaning of the agreement did not sufficiently appear.

At Law. Ruling on demurrer.

*T. A. Green*, for plaintiff.

*Willard Teller*, for defendants.

HALLETT, J., (*orally.*) William B. Sipes brought suit against J. Fenton Seymour, Ellen R. Seymour, and William G. Pell, on a contract which I will read:

"For, and in consideration of, the sum of eight hundred (800) dollars to me in hand paid, as well as for services rendered, I hereby agree to pay, or cause to be paid, to William B. Sipes, of the city of New York, or to his legal representatives, a commission of ten (10) per centum on the cash that may be received for the Slide mine, located in Gold Hill mining district, Boulder county, Colorado, on a sale of the same being effected in London or in Europe, and also to allow and cause to be delivered to the said Sipes, or to his legal representatives, all certificates of shares of stock that may be received in payment for the said Slide mine over and above the amount of such shares at the price at which I may accept the same as will make the net price received by me for the said mine two hundred and twenty-five thousand (225,000) dollars.

"*New York, Dec.* 19, 1881.

[Signed] "J. F. SEYMOUR."

Plaintiff avers that the mine was sold by Seymour to one Halderman for $200,000 cash, and $800,000 in stock, and thereupon he became entitled to have from defendants $25,000 in money on account of the cash received, and $575,000 on account of the stock. A demurrer was presented to the complaint on several grounds, as that it is ambiguous and unintelligible; that there is a misjoinder of defendants, and some other matters. The contract upon which the suit is founded is not easily understood. If it stopped with the first clause,—that which relates to the payment of 10 per cent. of the cash which might be received from the Slide mine,—it would be plain enough; but the second clause, which provides for delivering all certificates of shares of stock over and above what would make the net price of the mine $225,000, seems to put the whole instrument into some doubt. Whether it was intended that the mine should be sold for cash only, or for stock only, or for both cash and stock, is not stated in the complaint, and does not appear in the agreement itself. Looking to the agreement only, it may mean one thing or another, according to the understanding of the parties at the time it was drawn. If it was intended that the mine should be sold for cash only, if that was the expectation of the parties, then the first part of the agreement only will be operative, which provides for the payment of 10 per centum of the cash so received. If it was intended that the mine should be sold for stock in a company to be organized, and that the entire payment should be made in stock, then it would seem that it was the understanding of the parties that Seymour should have a price fixed upon the stock, something different and aside from its face value probably; and, looking to that price, which would be fixed by the parties purchasing the mine and himself, he would take enough of the stock to amount to $225,000, according to the price so fixed, and all of the stock in excess of that number of shares would go to Sipes under this agreement. If it was the expectation of the parties that the property would be sold partly for cash, and partly for stock, as, according to the averment in the complaint, the fact was,—that is to say, if the mine was so sold partly for cash and partly for stock,—then it is difficult to understand the agreement at all, because apparently under the first clause of the agreement Sipes was to have 10 per cent. of the cash, and if the cash was less than $225,000, then Seymour was to take enough of the stock

to make up $225,000 at some price or another, and Sipes was to have all of the excess over that number of shares. It is quite clear that the negotiations of the parties, or at least what their understanding was in respect to this matter, must be ascertained before we can come to any correct construction of the agreement; and nothing of that kind is set forth in the complaint. This instrument was drawn and executed in New York, and, according to the complaint, the consideration proceeding from Sipes to Seymour was $800 cash, and about $500 more paid out for maps and plans to be used in making sale of the mine. That was something like $1,300. Upon that payment, Sipes, if his own statements in this complaint are to be regarded, is to recover from the defendants here over $500,000. Such an agreement as that would require very close scrutiny to see whether it is not within the usury law of the state of New York, where the paper was drawn. In any event, before we can reach a conclusion as to what the agreement may be, and before we can allow any action to stand upon it, we must know what the understanding of the parties was at the time this agreement was drawn, what they were trying to express in writing, not for the purpose of varying the terms of the writing, or contradicting it, not for the purpose of avoiding it in any way, but merely to understand it, to know its meaning. The plaintiff has not in his complaint set forth any of the negotiations. He has not told us with what understanding the parties made this agreement. Therefore we cannot reach any conclusion upon it. I think the demurrer ought to be sustained. The plaintiff ought to be required to give more of the circumstances of the agreement between the parties at the time this instrument was drawn, so that we may know what theory they were proceeding upon when they made this paper. It may be true, as is contended by the plaintiff, that if this was drawn by J. F. Seymour, with the authority and under the direction of the other defendants in the suit, Mrs. Seymour and Pell, they are bound equally with J. F. Seymour. I think probably that is true; but the more important matter for us in the outset is to get some understanding about what the agreement means; what the purpose of the parties was when they framed it; how it is to be construed in order to determine the rights of the parties in respect to it.